FILED

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

2022 JAN 28 P 3: 52

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| *ex rel.* JOSEPH WALTON, ) | Civil Action No. 1:22 CV 092 LMB/IDD |
| ) | |
| *Relator*, ) | |
| ) | **Filed Under Seal Pursuant** |
| v. ) | **to 31 U.S.C. § 3730(b)(2)** |
| ) | |
| CONSTELLIS HOLDINGS, LLC., ) | |
| ) | |
| ) | **JURY TRIAL DEMANDED** |
| ) | |
| *Defendant*. ) | |

## COMPLAINT

Relator Joseph Walton, by and through undersigned counsel, brings this action on behalf of the United States of America against Defendant Constellis Holdings, LLC ("Constellis" or "the Company" or "Defendant") under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733.

## INTRODUCTION

1.     This case involves false certifications of compliance with federal regulations requiring medical clearance for overseas deployment. Specifically, Relator has evidence—derived from firsthand observations—showing that Defendant Constellis falsely certified compliance with regulations that strictly require *pre-* and *post-* deployment mental health assessments of personnel deployed overseas. Defendant did not perform the required mental health assessments and therefore improperly deployed unqualified personnel—with pre-existing mental health conditions—to combat zones overseas.

## JURISDICTION AND VENUE

2.      This action arises under the False Claims Act, as amended, 31 U.S.C.§§ 3729-3733. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and subject matter jurisdiction under the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*

3.      This Court has personal jurisdiction over the Defendant because it can be found in, and transacts business in, the United States. Defendant Constellis has its principle place of business in Herndon, Virginia.

4.      Venue lies in this district under 28 U.S.C. § 1391(b) & (c) and 31 U.S.C. § 3732(a) because the Defendant transacts business in this district.

## THE PARTIES

5.      Relator Walton is an adult citizen and resident of Ohio.

6.      Relator Walton has independent knowledge of the allegations against the Defendant and is the original source of the allegations contained in this Complaint.

7.      Before filing this Complaint, Relator Walton served the U.S. Attorney for the Eastern District of Virginia and the Attorney General of the United States with a disclosure of all material evidence and information in his possession as required by 31 U.S.C. § 3730(b)(2).

8.      The real party-in-interest to the claims set forth herein is the United States of America.

9.      Defendant Constellis is a limited liability corporation with its principal place of business in Herndon, Virginia.

10.     Defendant Constellis is a defense contractor engaged in the business of deploying contracting personnel overseas to support U.S. Forces in combat zones, such as Iraq and Afghanistan.

2

## LEGAL FRAMEWORK

### A. <u>The False Claims Act ("FCA")</u>

11.     The False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

12.     The FCA also provides that any person who "makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" is similarly liable to the United States for a civil monetary penalty, plus treble damages. 31 U.S.C. § 3729(a)(1)(G).

13.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

14.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or

3

demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

15.   "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

16.   Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 and 64 Fed. Reg. 47099 (1999), the FCA civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999. The Federal Civil Penalties Adjustment Improvements Act of 2015 and its implementing regulations linked FCA civil penalties to inflation.

**B. Federal Regulations Require Medical Clearance For Mental Health Conditions**

**i.   *Pre-* and *post-* deployment mental health screening.**

17.   Pursuant to federal law, contractors are required to screen personnel for mental health conditions both pre- and post- deployment overseas.

18.   32 C.F.R. 158.7 requires that any defense contracting personnel deploying as contractors to accompany the force ("CAAF") must undergo medical and dental readiness examinations. The authority for this regulation is Public Law 110-181 and Public Law 110-417 (2011).

19.    32 C.F.R. 158.7(b) states: Medical and Dental Evaluations. (1) All CAAF deploying in support of a contingency operation must be ***medically***, ***dentally***, and ***psychologically fit*** for deployment as stated in DoD Directive 6200.04 (see http://www.dtic.mil/whs/directives/corres/pdf/620004p.pdf) (emphasis added). Fitness specifically includes the ability to accomplish the tasks and duties unique to a particular operation and the ability to tolerate the environmental and operational conditions of the deployed location.

Under the terms and conditions of their contracts, defense contractors will provide medically, dentally, and psychologically "**fit**" contingency contractor personnel to perform contracted duties." (emphasis added).

22.     Pursuant to 32 C.F.R. 158.7(b)(2): "Just as military personnel must pass a complete health evaluation, CAAF shall have a similar evaluation based on the functional requirements of the job. All CAAF must undergo a medical and dental assessment within 12 months prior to arrival at the designated deployment center or Government-authorized contractor-performed deployment processing facility."

23.     This *pre-* and *post-* deployment medical examination must include an assessment of psychological readiness to deploy. 32 C.F.R. 158.7(b)(2), in fact, goes on to state: "This assessment should emphasize diagnosing cardiovascular, pulmonary, orthopedic, neurologic, endocrinologic, dermatologic, **psychological**, visual, auditory, dental, and other systemic disease conditions that may preclude performing the functional requirements of the contract, especially in the austere work environments encountered in some contingency operations." (emphasis added).

24.     The responsibility to perform appropriate medical screening is a responsibility of the contractor, not the government: "In accordance with DoD Instruction 6490.03, contracts shall require that CAAF complete a pre-deployment health assessment in the DMSS at the designated deployment center or a Government-authorized contractor-performed deployment processing facility. These assessments will only be used by the DoD to accomplish population-wide assessments for epidemiological purposes, and to help identify trends related to health outcomes and possible exposures. They will not be used for individual purposes in diagnosing conditions or informing individuals they require a medical follow-up. Diagnosing conditions requiring medical referral is a function of the contractor." 32 C.F.R. 158.7(b)(3).

25.     A diagnosis of one of the disqualifying medical conditions outlined in section 158.7 will normally prevent an individual from deploying: "In general, CAAF who have any of the medical conditions in paragraph (j) of this section, based on an individual assessment pursuant to DoD Instruction 6490.03, **should not deploy**." 32 C.F.R. 158.7(b)(4) (emphasis added).

26.     In accordance with DoD Instruction 6490.03, contracts shall require that CAAF complete a post-deployment health assessment in DMSS at the termination of the deployment (within 30 days of redeployment). 32 C.F.R. 158.7(b)(8).

27.     One of the purposes of the pre-deployment medical screening is to evaluate whether an individual with a disqualifying medical condition meets the criteria to still deploy:

> *Pre-Existing Medical Conditions.* All evaluations of pre-existing medical conditions should be accomplished prior to deployment. Personnel who have pre-existing medical conditions may deploy if all of these conditions are met:
>
> (1) The condition is not of such a nature that an unexpected worsening is likely to have a medically grave outcome or a negative impact on mission execution.
>
> (2) The condition is stable and reasonably anticipated by the pre- deployment medical evaluator not to worsen during the deployment under contractor-provided medical care in-theater in light of the physical, physiological, psychological, environmental, and nutritional effects of the duties and location.
>
> (3) Any required ongoing health care or medications must be available or accessible to the contractor, independent of the military health system, and have no special handling, storage, or other requirements (e.g., refrigeration requirements and/or cold chain, electrical power requirements) that cannot be met in the specific theater of operations. Personnel must deploy with a minimum 90-day supply of prescription medications other than FHPPPs.
>
> (4) The condition does not and is not anticipated to require duty limitations that would preclude performance of duty or to impose accommodation. (The nature of the accommodation must be considered. The Combatant Command surgeon (or his delegated representative) is the appropriate authority to evaluate the suitability of the individual's limitations in- theater.)
>
> (5) There is no need for routine out-of-theater evacuation for continuing diagnostics or other evaluations.

6

32 C.F.R. 158.7(i).

28.     32 C.F.R. 158.7(j) outlines a number of disqualifying medical, dental, and psychological conditions. From a mental health perspective, these include:

    a.   "Physical or psychological conditions resulting in the inability to effectively wear IPE, including protective mask, ballistic helmet, body armor, and CBRN protective ensemble, regardless of the nature of the condition that causes the inability to wear the equipment if wearing such equipment may be reasonably anticipated or required in the deployed location." 32 C.F.R. 158.7(j)(i).

    b.   "An acute exacerbation of a physical or mental health condition that could affect duty performance. 32 C.F.R. 158.7(j)(vii).

    c.   Psychotic and/or bipolar disorders. For detailed guidance on deployment-limiting psychiatric conditions or psychotropic medications, see ASD(HA) Memorandum "Policy Guidance for Deployment-Limiting Psychiatric Conditions and Medications" November 7, 2006 (see http://www.ha.osd.mil/policies/2006/061107_deployment-limiting_psych_conditions_meds.pdf). 32 C.F.R. 158.7(j)(xxvi).

    d.   Psychiatric disorders under treatment with fewer than 3 months of demonstrated stability. 32 C.F.R. 158.7(j)(xxvii).

    e.   Clinical psychiatric disorders with residual symptoms that impair duty performance. 32 C.F.R. 158.7(j)(xxviii).

    f.   Mental health conditions that pose a substantial risk for deterioration and/or recurrence of impairing symptoms in the deployed environment. 32 C.F.R. 158.7(j)(xxix).

**ii. Waivers.**

29.     Contractors may, at times, obtain waivers of the above regulations for unqualified persons.

30.     Contractors must request a waiver from the combatant command.

31.     There are no blanket waivers.

32.     Each waiver must be particularized to a specific individual because the criteria for granting a waiver requires an evaluation of whether that individual will be able to successfully support the mission and avoid further deterioration of his or her mental health condition.

33.     Waiver requests must be routed through the Combtatant Command Surgeon, and the approval authority for a waiver is the Combatant Commander.

### iii.   Defendant Constellis—which falsifies compliance with mental health assessments—knowingly defrauds the United States.

34.     Defendant Constellis is a defense contractor formed to support the U.S. Forces overseas.

35.     Defendant Constellis was established in 2011 and holds several notable defense contracting companies including, among others, Triple Canopy and Academi.

36.     Since 2001, the United States' wars in Iraq and Afghanistan, as well as other locations around the world, has required substantial support from defense contractors such as Defendant Constellis.

37.     Defendant Constellis, like other contractors, provides all manner of support to U.S. Forces, including but not limited to: logistical support, technical expertise, repair and maintenance of weapons and proprietary technological systems, language translation and interpreting, and kinetic security services.

38.     Because an active combat zone is both a dangerous and stressful environment, the United States requires all personnel accompanying U.S. military forces to be "medically cleared" for deployment.

39.     Defendan Constellis, however, blatantly ignored its obligation to screen contractor personnel for psychological and mental readiness.

8

40.     Defendant's violation of federal regulations requiring *pre*-deployment screening exposed unqualified and unfit personnel to significant psychological and mental harm upon deployment.

41.     Defendant's subsequent violation of federal regulations requiring *post*-deployment psychological and mental screening once again exposed the same unqualified personnel to further harm.

42.     Defendant's egregious—and repeated—disregard of the mental health clearance requirements effectively "passed the bill" on to the United States and the United States taxpayers to later provide for medical care and compensation owed to individuals who sustained medical and/or mental harm from such improper deployments.

43.     By orchestrating improper deployments, Defendant Constellis defrauds the United States in several ways: *First*, Defendant deploys personnel that are not qualified to serve under the contract. As a result, the United States is not obtaining the qualified personnel for which it has contracted. *See U.S. ex rel. Badr v. Triple Canopy,* No. 13-2190 (4th Cir. 2017). *Second*, the unqualified personnel who deploy exacerbate their psychological conditions and require significant treatment upon their return.

44.     Contractor personnel who suffer injuries while on deployment, which includes the worsening of prior medical or psychological conditions, are entitled to compensation under the Defense Base Act, a component of the Longshore Workers Compensation Program. 42 U.S.C. §§ 1651-1654. While claims under the DBA are initially paid by insurance carriers retained by the defense contractors, these claims may be subrogated to the United States Government if they were suffered as a result of a war hazard, as defined in the Act.

45.     Thus, defense contractors—such as Defendant Constellis—who flout the requirements of their contracts by falsely certifying compliance with mental health regulations pass the financial consequences of their conduct on to the United States taxpayer.

### iv.  Relator Walton's "knowledge" of the false certifications committed by Defendant Constellis.

### Military Service & Service-Related PTSD Diagnosis

46.     Relator Walton is a U.S. Army Veteran who suffers from significant mental health problems.

47.     Relator Walton deployed overseas multiple times, including to Iraq (April 2003 to September 2003), Afghanistan (September 2003 to June 2004), Iraq (June 2004 to December 2004), and then again Afghanistan (December 2004 until his retirement in October 2007).

48.     Relator Walton was "medically retired" from service in the U.S. Army in October 2007.

49.     Relator Walton suffers from a crippling mental health and psychological illness known as Post-Traumatic Stress Disorder ("PTSD").

50.     On or around 2009-2010, Relator Walton was diagnosed by the Veterans Administration ("VA") with PTSD, which was deemed service related in 2015. As a result, Relator Walton was classified 100% disabled in 2017.

51.     Relator Walton's PTSD—caused by his military service in the U.S. Army—manifests as various mental health issues, including (but not limited to): anxiety, depression, hypervigilance, trauma, fear, and insomnia.

**Deployment as Private Defense Contractor for Defendant Constellis**

52.     Despite his severe mental health issues---and following his medical retirement from the U.S. Army in 2007 and his PTSD diagnosis by the VA in 2009-2010—Relator Walton was nonetheless subsequently hired as a private defense contractor.

53.     From 2009 – 2010, Relator Walton worked for Solutions Development Corps in Afghanistan, where he taught military personnel about communications equipment.

54.     From 2010 – 2012, Relator Walton worked for Defendant Constellis's predecessor—Blackwater Worldwide—as a security contractor in Afghanistan.

55.     During this time period, Defendant Constellis (operating as predecessor Blackwater) held multiple contracts with the United States Department of State ("DOS") and Department of Defense ("DOD").

56.     In 2012, Relator Walton sustained a severe shoulder injury and returned to the United States as a result thereof.

**Aggravation of pre-existing mental health illness, PTSD**

57.     Relator Walton's work as a private security contractor for Defendant Constellis from 2010-2012 severely aggravated his ***pre-existing*** mental health condition—PTSD. Walton was exposed to a series of extremely hazardous war hazards throughout his contracting career with Blackwater.

58.     In 2017, for example, Relator Walton suffered from a severe panic attack and suicidal ideation.

59.     As a result of the suicidal ideation and severe panic attack, Relator Walton was hospitalized in a psychiatric unit for 72 hours.

60.    Relator Walton was subsequently placed in an inpatient psychiatric trauma treatment facility.

### Defendant Constellis knowingly deployed retired—but mentally-ill and therefore ineligible—military personnel to warzones overseas

61.    Despite his crippling mental illness and 2009/2010 VA PTSD diagnosis, Defendant Constellis nonetheless hired and deployed Relator Walton overseas—sending him into a hostile warzone in Afghanistan—as a security contractor.

62.    At the time of hiring, Relator Walton already had a VA rating for PTSD and Defendant Constellis knew or should have known of Relator Walton's pre-existing mental health condition and/or diagnosis.

63.    Because Relator Walton suffered from, and was already diagnosed with, a severe mental and/or psychological condition at the time Defendant Constellis hired him, Defendant Constellis was required—at a minimum—to seek a waiver to deploy Relator Walton overseas.

64.    Defendant Constellis did not seek a waiver and instead deployed Relator Walton—who was already diagnosed with PTSD—overseas to Afghanistan in 2010.

### Defendant Constellis admits it conducts no medical screening

#### *Pre-Deployment*

65.    Defendant Constellis stated in Walton's Defense Base Act case it has no records of having conducted a medical or psychological screening of Walton prior to his deployment.

66.    Even if Constellis did perform some medical and/or psychological screening, however, it was so negligible so as to render it meaningless. If a medically retired individual with a diagnosis of PTSD can make it through the Blackwater/Constellis screening process without raising the question of seeking a mandated medical waiver, the screening is worthless.

67.    On July 24, 2020, counsel for Relator Walton deposed Adam Krupa, in-house counsel for Defendant Constellus, in connection with Relator's DBA claim.[1]

68.    Defendant's attorney, Mr. Krupa, testified that he [Krupa] was Defendant's country manager for Afghanistan and therefore had visibility over all contracts within the country and all personnel assigned to said contracts.

69.    Defendant's attorney, Mr. Krupa, further testified that although he believed Defendant conducted a *pre*-deployment medical screening, he [Krupa] could not explain how Relator Walton—a mentally ill veteran diagnosed with PTSD in 2009/2010—could have possibly qualified for deployment with Defendant as a contractor.

70.    Mr. Krupa further testified and admitted that, to his [Krupa's] knowledge, Defendant Constellis did **not** seek waivers for personnel [such as Relator Walton] to deploy.

71.    Defendant Constellis did not seek a waiver, as required, to deploy Relator Walton, an ineligible person with a disqualifying, pre-existing medical condition.

### *Post-Deployment*

72.    Defendant's attorney, Mr. Krupa, admitted that Defendant Constellis did **not** conduct a *post*-deployment medical screening [on Relator Walton], as required, and does **not** conduct post-deployment screenings on *any* personnel returning from overseas.

### *Walton's Experience is the Rule, not the Exception*

73. Upon information and belief, Relator Walton's experience with Blackwater/Constellis is not the exception – it is the rule. Throughout the past two decades, Blackwater/Constellis has deployed numerous individuals overseas with significant medical and psychological conditions that at a minimum should have required a Combatant Command-granted waiver.

---

[1] Relator Walton's DBA claim was settled. Upon information and belief, Defendant Constellis subrogated this claim back to the United States.

## CAUSES OF ACTION

### COUNT I
### Violations of 31 U.S.C. § 3729(a)(1)(A)
### False Claims

74.     Relator Walton re-alleges and incorporates by reference all foregoing paragraphs as if fully set forth herein.

75.     By virtue of the acts described above, Defendant Constellis knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

76.     Defendant Constellis, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, false or fraudulent claims in violation of, inter alia, 31 U.S.C. 3729(a)(1)(A).

77.     Defendant Constellis knowingly provided materially false certifications and representations to the Department of Defense and/or Department of State and the United States Government, when it:

(a) falsely certified and screened—or failed to medically screen—Relator Walton (and other ineligible military personnel) for disqualifying pre-existing mental health and/or psychological conditions prior to deployment, in violation of  DoD Instruction 6490.03 and 32 C.F.R. 158.7 *et seq.*, which states, in part, that individuals who have any of the disqualifying medical conditions in paragraph (j) of that section, "should not deploy." 32 C.F.R. 158.7(b)(4); 32 C.F.R. 158.7 *et seq.;*

(b) falsely certified and approved Relator Walton and other ineligible military personnel as "fit" for deployment;

(c ) deployed Relator Walton (and other ineligible military personnel) to hostile warzones

overseas who, as a result of their psychological condition, were not medically "fit" to accomplish the tasks and duties unique to a particular operation and did not possess the ability to tolerate the environmental and operational conditions of the deployed location, as required;

(d) falsely certified and screened—or failed to medically screen—Relator Walton (and other ineligible military personnel) post-deployment, in violation of DoD Instruction 6490.03, which states that contracts shall require a post-deployment health assessment in DMSS at the termination of the deployment (within 30 days of redeployment). 32 C.F.R. 158.7(b)(8).

78.    By virtue of Defendant Constellis providing these false certifications, the Defendant submitted false claims to the United States for payment. These false claims include, but are not limited to, invoices under the relevant indefinite delivery, indefinite quantity (IDIQ) contracts with DOD and DOS.

79.    By virtue of the false claims presented or caused to be presented by Defendant Constellis, the United States suffered damages in that finite funds were improperly disbursed to an ineligible recipient based on Defendant's false or fraudulent certifications and claims, and the United States is therefore entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties for each violation.

## COUNT II
### Violations of 31 U.S.C. § 3729(a)(1)(B)
### False Records

80.    Relator Walton re-alleges and incorporates by reference all foregoing paragraphs as if fully set forth herein.

81.    By virtue of the acts described above, Defendant Constellis knowingly made, used, or caused to be made or used false records and statements, to get the false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(B),

presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(B).

82.    Defendant Constellis, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, made, used, caused to be made, or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved, in violation of, inter alia, 31 U.S.C. 3729(a)(2) (and as amended 31 U.S.C. §3729(a)(1)(B)).

83.    These records and statements material to the false claims made by Defendant Constellis included, but are not limited to, Defendant Constellis's false records, documents, statements, approvals, and all other accompanying documentation and representations which falsely certified that Defendant Constellis and its ineligible personnel met the eligibility requirements for deployment.

84.    By virtue of the false records or false statements caused to be made by Defendant Constellis, the United States suffered damages and is therefore entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties for each violation.

### COUNT III
### Violations of 31 U.S.C. § 3729(a)(1)(G)
### Reverse False Claims

85.    Relator Walton re-alleges and incorporates by reference all foregoing paragraphs as if fully set forth herein.

86.    Defendant Constellis knowingly caused to be made or used false records or false statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States and knowingly concealed and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

87.    By virtue of the false records or false statements caused to be made by Defendant

Constellis, Defendant was able to retain unearned and/or fraudulently obtained payments and maintain higher levels of payments than it would have otherwise earned had its records or statements been truthful, in violation of 31 U.S.C. § 3729(a)(1)(G).

88.     As a result of Defendant Constellis's knowing submittal of the false records or false statements, the United States suffered damages and is therefore entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties for each violation.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator Walton, on behalf of the United States, prays that judgment be entered in his favor and against Defendant Constellis as follows:

89.     That Defendant Constellis pay the United States triple the amount of damages to be determined, plus the appropriate civil penalties for each false claim, statement, or record;

90.     That Relator Walton be awarded all reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d)(1) and 31 U.S.C. § 3730(d)(2);

91.     That in the event that the United States proceeds with this action, Relator Walton, for bringing this action, be awarded an amount of at least fifteen percent but not more than twenty-five percent of the proceeds of any award or the settlement of the claims;

92.     That in the event that the United States does not proceed with this action, Relator Walton be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall not be less than twenty-five percent nor more than thirty percent of the proceeds of any award or settlement;

93.     That Relator Walton be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

94.     That Relator Walton be awarded pre-judgment and post-judgment interest; and

17

95.    The Court award such other and further relief as is just, equitable, and proper.

**Relator Walton demands a jury on all issues so triable.**

December 7, 2021

JOSEPH WALTON

By: _____
John R. Thomas, Jr.
Counsel for the Relator

John R. Thomas, Jr. (VSB No. 75510)
HAFEMANN MAGEE THOMAS, LLC
11 Franklin Road, SW
P.O. Box 8877
Roanoke, Virginia 24014
(540) 759-1660
jt@fed-lit.com
     *Counsel for Relator*